IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATARA MULTIMEDIA GROUP INC., and EVENT LIFE LLC, | ) ) ) | |
| Plaintiffs, | ) ) | No. 14 C 2791 |
| v. | ) ) | Judge Joan H. Lefkow |
| ERINEO "EDDIE" CARRANZA, CONGRESS THEATRE INC., CONGRESS CORPORATION, 2117 – 2139 N MILWAUKEE PROPERTY, LLC, ALBERTO SOLORIO, DON SNOW, TYLER DEROO, ATHEN/ ATIEH IRAYYAN, AHMAD MAHIDI, MAY DAY, and TICKETFLY INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Natara Multimedia Group Inc. ("Natara") and Event Life LLC ("Event Life") filed an amended complaint against Congress Theatre Inc. ("Congress Inc."), Congress Corporation, 2117 – 2139 N Milwaukee Property, LLC, Ticketfly Inc. ("Ticketfly"), and individuals associated with the Congress Theatre, a historic theatre in Chicago, Illinois ("the Theatre"). (Dkt. 29 ("Compl.").) Plaintiffs, concert producers in the Chicago area, allege that defendants engaged in a scheme to defraud plaintiffs of contractually guaranteed ticket- and liquor-sale revenue earned at three concerts held at the Theatre in 2012 and 2013. Plaintiffs bring claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, as well as claims for breach of contract, intentional misrepresentation, conversion, and civil conspiracy. (*Id.*) Defendants have moved to dismiss the amended complaint under Federal Rule

1

of Civil Procedure 12(b)(6).[1] (Dkt. 30.) For the reasons stated below, defendants' motion is granted.[2]

## BACKGROUND[3]

**I.     The Parties**

Natara and Event Life are closely held corporations that produce concerts in Chicago, Illinois. (Compl. ¶¶ 5–6.) Natara is owned and controlled by Nick Huminsky, and Event Life is owned and controlled by George Herrera. (*Id.*)

Although not specified in the amended complaint, Congress Inc. and Congress Corporation are presumably the legal entities through which the Theatre conducts business. Similarly, the court presumes that 2117 – 2139 N Milwaukee Property, LLC is the owner of the property on which the Theatre is located.

Ticketfly[4] is a corporation that partners with concert promoters and venues to sell concert tickets around the country. (*Id.* ¶ 12.) It maintains its principal place of business in San Francisco, California (*id.*) and claims to be the exclusive ticket service for the Theatre (dkt. 31 at 3).

The remaining defendants are individuals associated with or employed by the Theatre, Congress Inc., or Congress Corporation. Erineo "Eddie" Carranza owns and controls the

---

[1] More specifically, defendants Mahidi, Snow, Carranza, and Congress Corporation filed a motion to dismiss (dkt. 30), in which defendant Ticketfly joined (dkt. 31). Ticketfly's motion for joinder in the motion to dismiss is granted.

[2] The court has jurisdiction under 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1367(a) (supplemental jurisdiction). Venue is appropriate in this district under 28 U.S.C. § 1391(b).

[3] Unless otherwise indicated, the following facts are taken from the amended complaint and are presumed true for the purpose of resolving the pending motion. *See Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011) (citation omitted).

[4] Plaintiffs sometimes refer to Ticketfly as "Ticket Fly." (*See, e.g.*, Compl. ¶ 12.) The court opts for "Ticketfly," the spelling used by Ticketfly itself. (*See* dkt. 31 at 1.)

Theatre. (Compl. ¶ 7.) Alberto Solorio is a relative of Carranza and serves as "a business accountant/controller." (*Id.* ¶ 8.) Tyler Deroo is the Theatre's "other controller" and works as a "venue manager in charge of processing Carranza bank wires and finances." (*Id.* ¶ 9.) Don Snow is a ticket scalper who works for Carranza. (*Id.* ¶ 10.) May Day is a Chicago police officer who heads the Theatre's security and serves as Carranza's "street enforcer." (*Id.* ¶ 11.) He is the brother of Athen (also known as Atieh) Irayyan and Ahmad Mahidi, who are managers at the Theatre. (*Id.*)

## II. The Natara Concerts

### A. October 13, 2012

On August 7, 2012, Natara and Congress Inc. entered into a contract to present a concert at the Theatre on October 13, 2012. (*Id.* ¶ 14; dkt. 29-2 Exh. B.) The agreement provided that Natara would "have full control of all ticket revenue" and would receive "100% [of] the balance of ticket sales." (Dkt. 29-2 Exh. B ¶ 2(a).) The parties agreed that Congress Inc. would receive 100% of gross liquor-sale proceeds. (Compl. ¶ 15.)

Despite the plain language of the contract, Natara was denied its right to ticket-sale revenue. Specifically, on the day of the concert, Huminsky observed individuals unaffiliated with Natara selling tickets on the streets outside the Theatre. (*Id.*) These sales were not reported to Natara and violated the terms of the contract between Natara and Congress Inc., which gave Natara complete control of ticket sales. (*Id.*) Later that night, the ticket scanners provided by the Theatre were not charged properly and did not work, forcing Natara's door staff to collect tickets by hand and place them in garbage bags. (*Id.* ¶ 17–18.) Then, Carranza's staff, including May Day, Irayyan, and Mahidi, took the bags and resold the tickets outside the Theatre for a price lower than that offered at the door. (*Id.* ¶¶ 18, 21.) As a result, defendants deprived Natara of

3

"walk-up" ticket sales, and because defendants did not report to Natara the revenue earned from scalping the tickets, defendants denied Natara its right to receive ticket-sale revenue under the contract. (*Id.* ¶ 22.) Indeed, although defendants reported that only 3,300 tickets had been sold, plaintiffs claim that a 4,700 capacity crowd attended the concert on October 13. (*Id.* ¶ 23.) While not specified in the amended complaint, the original complaint indicates that Natara lost $42,000 on the October 13 concert. (Dkt. 1 ¶ 27.)

### B.     April 13, 2013

In the weeks following October 13, 2012, Carranza met with Huminsky at a sports bar in Barrington, Illinois. (Compl. ¶ 26.) Huminsky demanded that Carranza pay him the ticket-sale revenue due under the contract, but Carranza responded that he did not have the money. (*Id.*) Nevertheless, Carranza persuaded Huminsky to produce another concert at the Theatre. (*Id.* ¶¶ 26, 43.) Carranza assured Huminsky that he "would recoup the money he lost on the October 13, 2012 concert by sharing ticket *and* liquor sales equally." (*Id.* ¶ 26 (emphasis in original).)

On January 18, 2013, Natara and Congress Corporation entered into a contract to present a concert at the Theatre on April 13, 2013. (*Id.* ¶ 43; dkt. 29-3 Exh. C.) In accordance with Carranza and Huminsky's discussion, the contract provided that Natara would receive 50% "of the gross proceeds from the door admission and all ticket sales" and 50% "of all Liquor and Bar Sales." (Dkt. 29-3 Exh. C ¶¶ (2)(a)–(b).)

Tickets for the concert sold out "in record time." (Compl. ¶ 47.) In fact, the demand was so great that Huminsky and Carranza discussed adding a second show in April 2013. (*Id.*) Carranza told Huminsky, however, that the City of Chicago was attempting to close down the Theatre. (*Id.*) As a result, the second concert never materialized, "causing [Natara] additional great financial loss." (*Id.*) Natara estimates the loss at $70,000. (*Id.* ¶ 52.)

4

On the night of the concert, Carranza introduced Huminsky to Snow. (*Id.* ¶ 48.) Snow had purchased a large number of tickets for the April 13 concert and had been selling tickets with a face value of $20 for $200 both online and "through his personal network of street purchasers." (*Id.* ¶¶ 48–49.) Snow offered to buy additional tickets from Huminsky, but Huminsky refused. (*Id.* ¶ 48.)

Later that evening, Huminsky walked in on Carranza printing stacks of tickets in the box office, the implication being that Carranza was planning to sell the tickets without notifying Huminsky, thus denying Natara ticket-sale revenue due under the contract. (*Id.* ¶ 49.) When Huminsky confronted him, Carranza stated that "the City of Chicago was shutting down his theater and he was going to keep all the money and do whatever he wanted to do." (*Id.*) Over the course of the evening, Huminsky demanded payment from Carranza several times, but Carranza repeatedly refused. (*Id.* ¶ 50.)

Huminsky hired a "point-of-sale" manager to monitor the Theatre's liquor sales and to ensure that defendants' accounting practices were legitimate. (*Id.*) Carranza, however, told Irayyan and Mahidi to prevent the point-of-sale manager from monitoring liquor sales and had security personnel follow Huminsky throughout the night. (*Id.*) Irayyan and Mahidi even cornered Huminsky and threatened him with bodily harm. (*Id.*)

Following the concert, Huminsky met with Carranza and Solorio at the same sports bar where they previously met in Barrington, Illinois. (*Id.* ¶ 53.) Solorio provided Huminsky with a "false settlement statement" that included charges for "liquor taxes and expenses that were not legitimate." (*Id.*) As result of defendants' conduct, plaintiffs lost $130,000 in ticket- and liquor-sale revenue in connection with the April 13 concert. (*Id.* ¶ 52.)

5

### III. The Event Life Concert

On February 1, 2013, Event Life contracted with Congress Corporation to present a concert at the Theatre on March 23, 2013. (*See* dkt. 29-4 Exh. D.) Although defendants wanted to sell tickets through Ticketfly, Congress Corporation and Event Life agreed that all ticket-sale proceeds would go to Event Life.[5] (Compl. ¶ 30.)

On the night of the concert,[6] the ticket scanners provided by Congress were not working and no replacements were available. (*Id.* ¶ 33.) Members of Event Life's door staff were forced to collect the tickets by hand and place them in garbage bags. (*Id.*) Given the large number of people attempting to enter the Theatre, Event Life's door staff "could not maintain . . . pace"; members of Carranza's staff began pushing concert attendees into the venue, "overloading Event Life's check point [and] causing complete chaos." (*Id.*)

Once a majority of the crowd had entered the Theatre, members of Event Life's staff realized that some of the garbage bags of tickets were missing. (*Id.* ¶ 35.) In addition, concert attendees reported that a ticket scalper had approached them in the parking lot. (*Id.*) Event Life also noticed that complimentary tickets in excess of the agreed amount had been distributed. (*Id.* ¶ 38.) According to plaintiffs, defendants sold the complimentary tickets "and kept the money." (*Id.*)

After the concert, the ticket-sale revenue received by Event Life could not be reconciled with the number of people who had attended the concert. (*Id.* ¶ 39.) According to an undercover

---

[5] This term does not appear in the contract document. (*See* dkt. 29-4 Exh. D.)

[6] Plaintiffs also allege that on the day before the concert, Event Life was informed that the balcony of the Theatre would not be open during the concert because it had failed an inspection by the City of Chicago. (Compl. ¶ 32.) According to plaintiffs, the closure of the balcony resulted in a net loss of $19,200 because Event Life had already sold 200 balcony tickets and was on pace to sell the remaining 300 before the show. (*Id.*) The amended complaint does not explain why these allegations are relevant to plaintiffs' claims.

investigator hired by Event Life, 3,300 people had attended the concert, but defendants reported far fewer ticket sales. (*Id.* ¶¶ 35, 39.) Solorio met with Event Life staff on April 8, 2013 but could not explain the "shortfall." (*Id.* ¶ 39.) He provided an Excel spreadsheet recording the number of tickets sold, but Event Life requested a ticket-sale report generated by Ticketfly, which Event Life received a month later. (*Id.* ¶¶ 40–41.) The ticket sales recorded in that report did not match the figures contained in the Excel spreadsheet provided by Solorio. (*Id.* ¶ 41.) Eventually, "Carranza wire transferred a sum of money to Event Life which was far short of the money actually due." (*Id.* ¶ 42.) The amended complaint does not indicate how much money Event Life lost on the concert.[7]

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for failure to state a claim on which relief may be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at

---

[7] Other than identifying Deroo as one of the Theatre's "controllers" (*id.* ¶ 9), the amended complaint largely lacks specific allegations as to Deroo. Similarly, Ticketfly is infrequently mentioned in the amended complaint, except for the allegation that Ticketfly "assisted and conspired with Carranza by adding additional hidden ticket fees and credit card charges to tickets being sold for [Natara] shows." (*Id.* ¶ 45.) Plaintiffs explain that "Ticketfly systematically increased the credit card service fees to purchasers in order for Carranza to receive additional moneys to repay cash loans he made from Ticketfly." (*Id.*)

555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, --- U.S. ---, 135 S. Ct. 346, 346, --- L. Ed. 2d --- (2014) (per curiam) ("Federal pleading rules call for 'a short and plain statement of the claim showing the pleader is entitled to relief' . . . . [T]hey do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

### ANALYSIS

**I.     RICO Claims (Counts I, II, and III)**

Plaintiffs bring three RICO claims under 18 U.S.C. §§ 1962(b), (c), and (d).[8] Although there are significant substantive differences between these RICO provisions, plaintiffs must plead the existence of a "pattern of racketeering activity" to survive defendants' motion to dismiss under each of the RICO subsections.[9] *See* 18 U.S.C. §§ 1962(b), (c), (d); *see also Liquid Air Corp.* v. *Rogers*, 834 F.2d 1297, 1303–04 (7th Cir. 1987). Defendants contend, among other things, that all three claims must be dismissed on this basis.

"[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d

---

[8] The amended complaint also mentions 18 U.S.C. § 1962(a). (*See id.* ¶ 54.) Plaintiffs, however, do not list § 1962(a) as a separate count. Thus, the court will assume that plaintiffs do not intend to bring a claim under § 1962(a).

[9] While § 1962(d), the conspiracy subsection, does not explicitly contain the "pattern" requirement, the "failure to make out a substantive RICO claim requires dismissal of a conspiracy claim based on the same nucleus of operative fact" because "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense." *Meier* v. *Musburger*, 588 F. Supp. 2d 883, 911–12 (N.D. Ill. 2008) (citations omitted); *see also Stachon* v. *United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000). Plaintiffs do not dispute that their claim under § 1962(d) is based on the same nucleus of operative fact as their claims under §§ 1962(b) and (c). As such, plaintiffs must plead a pattern of racketeering activity to avoid dismissal of their claim under § 1962(d).

195 (1989) (emphasis in original). At a minimum, there must be two predicate acts of racketeering activity over a ten-year period, 18 U.S.C. § 1961(5), and a relationship between the predicate acts and a threat of continuing criminal activity—that is, "relatedness" and "continuity." *See H.J. Inc.*, 492 U.S. at 239. This standard is known as the "continuity plus relationship" test. *DeGuelle* v. *Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (citing *H.J. Inc.*, 492 U.S. at 239, 242).

Plaintiffs rely on mail and wire fraud as the predicate acts forming the alleged pattern of racketeering. More specifically, plaintiffs allege that in engaging in the scheme to defraud plaintiffs of contractually guaranteed ticket- and liquor-sale proceeds, defendants used the mails and interstate wires—including emails and text messages—in furtherance of the scheme. (*See* Compl. ¶¶ 58–63.) The parties do not dispute that these predicate acts are related.

Continuity, however, is not established. "[A] RICO plaintiff can satisfy the continuity prong either by (1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Roger Whitmore's Auto. Servs., Inc.* v. *Lake Cnty., Ill.*, 424 F.3d 659, 673 (7th Cir. 2005) (citation omitted). "[A] closed period of racketeering activity involves a course of criminal conduct that has ended." *Id.* at 672. Although not specified in the amended complaint, plaintiffs have indicated in recent court filings that Carranza has sold the Theatre. (*See* dkt. 35 at 1; dkt. 38 at 1.) Thus, plaintiffs have alleged a closed period, and because defendants no longer conduct business at the Theatre, it would seem that there is no credible threat of future harm sufficient to satisfy the continuity requirement.

That common-sense conclusion is supported by a traditional close-ended continuity analysis. Close-ended continuity turns on "(1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries." *Roger Whitmore's*, 424 F.3d at 673 (citing *Morgan* v. *Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). No single factor is dispositive. Rather, the analysis is "fact-specific" and aimed at achieving a "natural and commonsense" result "consistent with Congress's concern with long-term criminal conduct." *Id.* (citations omitted) (internal quotation marks omitted).

Here, the fraudulent scheme spanned just over eight months, from the execution of the August 7, 2012 agreement through the April 13, 2013 concert, and plaintiffs have not indicated that defendants engaged in other racketeering schemes before or after this closed period. That eight-month period is too short to constitute a pattern of racketeering activity. *See Jennings* v. *Auto Meter Prods., Inc.*, 495 F.3d 466, 474 (7th Cir. 2007) (ten months insufficient); *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) (rejecting scheme spanning less than nine months on continuity grounds); *Midwest Grinding Co., Inc.* v. *Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) (finding nine-month period insufficient and noting that duration "is perhaps the closest thing we have to a bright-line continuity test"). Plaintiffs have not specified how many acts of mail and wire fraud occurred, but even if they had, "[t]he Seventh Circuit . . . does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Hartz* v. *Friedman*, 919 F.2d 469, 473 (7th Cir. 1990). Indeed, "a multiplicity of mailings does not necessarily translate directly into a 'pattern' of racketeering activity." *Lipin Enters. Inc.* v. *Lee*, 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring). Further, plaintiffs have alleged two victims, Natara and Event Life, who have suffered a finite

number of economic injuries corresponding to each of the three concerts at issue in this case. *See Roger Whitmore's*, 424 F.3d at 673 ("[T]he victims of the defendants' activities were confined to a small group . . . which does not help Roger's case for continuity."). And finally, plaintiffs have alleged one overarching scheme designed to deprive concert producers of their contractual rights. *See id.* ("Although a RICO pattern may be established on the basis of a single scheme, it is not irrelevant . . . that there is only one scheme." (citations omitted) (internal quotation marks omitted)). All of these factors point to the conclusion that plaintiffs have not alleged continuity.

Because the Theatre has been sold, open-ended continuity cannot be satisfied. There is no indication of a "specific threat of repetition" or predicate acts that "can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Vicom*, 20 F.3d at 782 (citations omitted) (internal quotation marks omitted). And while plaintiffs argue in their response brief that "the alleged predicates are in fact a regular way of conducting defendants' ongoing illegal business conduct" (dkt. 32 at 6), "[a] threat of continuity cannot be found from bald assertions such as '[defendant] continues his racketeering activities.'" *Vicom*, 20 F.3d at 783 (citation omitted). Indeed, given that the Theatre is closed, it is unclear how defendants could possibly continue to operate it through a pattern of racketeering activity. Because plaintiffs have failed to allege continuity, their RICO claims must be dismissed.

That dismissal will be with prejudice. Congress enacted RICO "to combat organized, long-term criminal activity," and the statute was not designed to permit plaintiffs to cast run-of-the-mill, state-law breach of contract and fraud claims as federal RICO actions. *Jennings*, 495 F.3d at 472 (citations omitted); *see also Carr* v. *Tillery*, 591 F.3d 909, 918 (7th Cir. 2010) ("RICO is not a proper vehicle for leveraging a breach of contract suit between citizens of the

same state into federal court, and under a statute that entitles a successful plaintiff to treble damages and attorneys' fees." (citations omitted)). Indeed, the Seventh Circuit has cautioned against allowing RICO to "becom[e] a surrogate for garden-variety fraud actions properly brought under state law," *Midwest Grinding Co., Inc.*, 976 F.2d at 1022, and has directed courts to "carefully scrutinize the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity," *Jennings*, 495 F.3d at 473 (citations omitted) (internal quotation marks omitted). Given the limited duration of the scheme alleged in the amended complaint, and the fact that plaintiffs have already had an opportunity to re-plead their RICO claims after reviewing defendants' original motion to dismiss (dkt. 21), dismissal with prejudice is appropriate.

## II. State-Law Claims (Counts IV, V, VI, and VII)

Plaintiffs also bring state-law claims for breach of contract, intentional misrepresentation, conversion, and civil conspiracy.[10] With the dismissal of the RICO claims, however, also goes the sole basis for invoking federal jurisdiction. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr.* v. *BP Prods. N. Am.., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) (citations omitted); *see also Williams* v. *Aztar Ind. Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003) (same).

There are three exceptions to this general rule: (1) when refiling the claims in state court is barred by the statute of limitations; (2) where substantial judicial resources have already been expended; and (3) when it is readily apparent how the state claims should be resolved. *Williams* v. *Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (citations omitted). None of these

---

[10] The amended complaint also mentions negligent misrepresentation and theft, neither of which is pleaded as a separate count. (Compl. ¶ 54.)

exceptions applies to this case. Because the claims will be dismissed on jurisdictional grounds, Illinois law gives plaintiffs additional time to refile them in state court, even if the statutes of limitations have already expired (and there is no indication that they have). *See* 735 Ill. Comp. Stat. 5/13-217 ("[I]f . . . the action is dismissed by a United States District Court for lack of jurisdiction, . . . then . . . the plaintiff . . . may commence a new action [in state court] within one year or within the remaining period of limitation, whichever is greater."). Further, the court has not yet expended substantial judicial resources on this case and it is not readily apparent how the state-law claims should be decided. Accordingly, the court declines to exercise supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion to dismiss the amended complaint (dkt. 30) is granted. Ticketfly's motion for joinder in the motion to dismiss (dkt. 31) is granted as well. Counts I, II, and III are dismissed with prejudice. Counts IV, V, VI, and VII are dismissed without prejudice to refiling in state court. This case is terminated.

Date: June 17, 2015

_____
U.S. District Judge Joan H. Lefkow